James L. COOPER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–761.

Court of Criminal Appeals of Oklahoma.

July 9, 1976.

Thomas E. Drummond, Pawhuska, Court-Appointed, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Doug Combs, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, James L. Cooper, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Osage County, Case No. CRF–75–73, with the crime of Robbery with a Dangerous Weapon, After Former Conviction of a Felony, in violation of 21 O.S.Supp.1973, § 801. Trial before a jury was had on the 10th and 11th days of June, 1975, at which time defendant was convicted and ordered to serve Twenty (20) years' imprisonment. From said judgment and sentence, defendant has filed his timely appeal.

The first witness for the State was a Mrs. Mary Darnold of Tulsa, Oklahoma, who testified that she was the sole owner and operator of a dress shop known as "The Mary Darnold Shop," located in the Osage Village Shopping Center at 806 N. Osage Drive, City of Tulsa, County of Osage, State of Oklahoma. She testified that she had operated the small dress shop since 1958; that on January 31, 1975, she was in the shop alone and was preparing to close at approximately 5:00 p. m. when a black man wearing a brown coat and stocking cap entered her premises. The man approached her directly and immediately pulled a small pistol from under his cap, placed the pistol directly against the upper torso of the witness' body, pulled the trigger and fired the weapon into the victim. The victim was able to remain on her feet for some time, at which time the assailant commenced to beat the victim with hands,

or fists, or some object against the back of the victim's head. At that time the victim fell to the ground in a state of semi-consciousness. At the time of the incident the victim was carrying a newspaper, a small jar of baking grease, and a large gold purse. The victim then identified a series of exhibits including the clothes she was wearing at the time of the incident, photographs of her establishment immediately after the incident, and her large gold purse which was subsequently recovered. The victim further demonstrated to the jury by standing and pointing at the wounds she had received during the incident. The victim could not identify the defendant in this case as being her assailant. The victim then testified that she went to St. John's Hospital in Tulsa where she was treated for gunshot wounds.

The next witness for the State was William R. Miller, a resident of Tulsa, Oklahoma, and an employee of the City of Tulsa as supervisor of the Gilcrease Museum. The witness testified that he was a retired United States Marine, and had served twenty-six years of active duty as a combat infantryman. His testimony was that at approximately ten minutes until five on the day in question, that is January 31, 1975, he went to a bar located next door to the dress shop owned by the victim. As he sat down to have a beer he heard what he thought to be a gunshot. He went to the window of the bar to investigate, and seeing nothing he then went to the door, looked out and again seeing nothing he walked outside. On looking toward the victim's dress shop he observed a black male, wearing a brown coat and stocking cap, coming out of the dress shop by walking backward. The black man was holding a weapon which the retired Marine later identified as a .32 caliber automatic. The man then turned and faced the witness for some few seconds while they stared at each other. As he did, the assailant raised the gun and pointed it toward the witness. After a few seconds the assailant turned and ran toward the parking area of the

Osage Village Parking lot. The witness then testified he observed the assailant enter the passenger side of a red convertible. The witness then identified the defendant in this case as the person whom he saw coming from the dress shop at approximately 5:05 p. m. on January 31, 1975, and the person who had the .32 caliber automatic in his hand. The witness testified that the defendant had another object in his left hand, but was unable to identify the same. The witness then returned to the area of the dress shop where he gave a description of the assailant to the police who had already arrived on the scene, plus a description of the automobile which the assailant had entered. This witness was then cross-examined about his drinking habits.

The next witness for the State was Ellen Lock, who testified that she lived in the City of Tulsa and was an employee of St. Francis Hospital on January 31, 1975. She further testified that at approximately 5:00 p. m. on that date she and her husband went to the Osage Village Shopping Center for the purpose of visiting the Med-X Store; that they parked in the vicinity of The Mary Darnold Shop and while exiting their car, observed what was described as a commotion around the front door of said dress shop. She then described that she saw a Negro male leave the dress shop wearing a long coat and a stocking cap, with a gun in his hand. This witness was unable to identify the defendant as the person who exited the dress shop.

The next witness for the State was Officer Higgins who testified he was a patrolman with the Tulsa Police Department. He testified that on January 31, 1975, he received a radio call to go to the scene of a shooting at 806 N. Osage. He arrived at the above address and found other officers already on the scene and there he received a description of the vehicle and the suspect inside the vehicle. He testified that he left the scene at approximately nine minutes after five p. m. at which time he drove approximately one block west from the cor-

ner of Apache and Osage, where he met a vehicle matching the description of the vehicle given to him containing suspects matching generally the description of suspects heretofore given to him. He then took steps to stop the suspect vehicle which he did at that time. His further testimony was that after calling for a backup unit the witness exited his car at which time he ordered the two occupants to get out of their car. At this time the witness identified the defendant as one of the occupants of the automobile he had stopped. He identified the defendant as being the occupant of the front passenger seat of the vehicle. He then testified about seeing a brown coat laying in the car; he searched the same and there found a .32 caliber automatic pistol. The witness then identified both the brown coat, pistol and clip containing four rounds of live ammunition. The State then offered into evidence the pistol and clip which were admitted over the objections of counsel for defense. The witness then identified a gold, woman's purse which was sitting in the back floorboard of the vehicle. The gold purse was then offered and admitted into evidence over objection of counsel for defense. The officer testified that he, at that time, placed the defendant, along with the driver of the car, under arrest for the offense of armed robbery. The officer then identified several photographs of the automobile which were taken at the scene of the arrest. Immediately after placing the defendant under arrest, the officer then advised both parties of their rights according to the *Miranda* decision. At that time the defendant acknowledged that he understood his rights by word of mouth. At that time the defendant stated, without being asked any questions, "I know what you are looking for—it's in the back seat." [Tr. 81] On cross-examination the witness testified that the defendant was not wearing a coat at the time of his arrest.

The next witness for the State was Mr. Ron Trekell, who testified that he was an investigator with the Tulsa Police Depart-

ment and had been so for eleven years. He testified that he went to the scene of the shooting at approximately ten to twelve minutes after five p. m. on January 31, 1975. Upon arriving at the scene he observed Mrs. Darnold sitting on the floor, leaning against a counter. The witness then identified the photographs taken of the interior of the store as it appeared upon his arrival at the scene. The witness further identified photographs of two .32 caliber spent shell casings which were found on the floor of the store. The photographs of the shell casings were offered and admitted into evidence over the objection of defense counsel. The witness then identified two shell casings, marked with his initials, as the shell casings recovered from the floor of the victim's shop. At this time the shell casings were offered and admitted over the objection of counsel for defense.

The next witness for the State was Mr. Otis Lee Anderson, who testified that he was the ambulance driver for Central Ambulance Company of Tulsa, Oklahoma, and that on January 31, 1975, he carried the victim, Mary Darnold, from her shop to St. John's Hospital in the City of Tulsa. He testified that upon arriving at the emergency room of the hospital he was assisting to undress her and prepare her for emergency treatment when a spent bullet fell from the clothing of the victim onto the floor. The witness testified that he picked the bullet up and immediately handed the same to a Tulsa Police Officer standing in the doorway of the emergency room. The witness could not identify the name of the police officer to whom he gave the spent bullet.

The next witness for the State was Donald Roy Spillers, who testified that he was a police officer for the City of Tulsa, Oklahoma, and that pursuant to his duties he went to St. John's Hospital on January 31, 1975, to conduct an investigation of a shooting that occurred in the City of Tulsa. The witness then identified a .32 caliber bullet which was given to him by the ambulance driver present in the emergency room. The witness then identified Otis Anderson as the man who gave him the bullet. The witness identified the bullet by his mark made with a pen knife on a flat surface. The bullet was then offered and accepted into evidence over objections of counsel for defense.

The next witness for the State was Mr. John McSherry, who testified that he was a police officer with the identification bureau of the Tulsa Police Department. The witness then identified the spent bullet and cartridge shells and testified that he packaged them for mailing at 5:45 p. m. on the 19th day of February, 1975, placed his initials thereon and left the same in the property room, and that on the 21st day of February, 1975, he returned to the property room, checked the exhibits out, and mailed the same to the Oklahoma State Bureau of Investigation, by registered mail.

The next witness was Mr. Carl M. Alred, who testified that he was a patrolman with the Tulsa Police Department and had been so employed for almost two years. He testified that a few minutes after 5:00 p. m. on January 31, 1975, he went to the scene where Officer Higgins had arrested Mr. Cooper and a Mr. Miller. He testified that after remaining at the scene for approximately ten minutes, he and the defendant left for the purpose of transporting defendant Cooper to the Tulsa Police Station. Officer Alred testified that en route to the Tulsa Jail, and while in his police unit, that he had a conversation with the defendant Cooper. At this time the jury was excused from the courtroom and a conversation was had between the witness, both counsel, and the court. At that time the court determined that witness Alred had advised defendant Cooper once again of his *Miranda* rights. The witness further testified that the defendant acknowledged that he knew and understood his rights. The police officer then testified that he did not, in fact, ask any questions of the defendant, but instead was asked a question by the defendant which was as

follows, "How is she?" To which witness Alred replied that he did not know for sure but he understood that she was real bad off and she might even possibly be dead. [Tr. 130] The witness further testified that the defendant repeated this question several times on the way to the station. On cross-examination the witness testified that to his knowledge the name of the other individual arrested was "Miller" and that when he arrived on the scene the person by the name of "Miller" was also handcuffed and under arrest. He further testified on cross-examination that the person named "Miller" was transferred to the Tulsa Police Station by some other unit.

The next witness for the State was Mr. Charles William Miller, who testified that he was a resident of Tulsa, Oklahoma, and had known the defendant for some time. He testified that in January of 1975, he owned and operated a 1956 Pontiac Catalina convertible, red in color. At about 10:15 a. m. on January 31, 1975, he saw the defendant in defendant's front yard at which time the defendant hollered and asked the witness for a ride to meet some friends. The witness at that time told the defendant that he had to go to the doctor, but the defendant agreed to go to the doctor with him and rode with him to some location on East or West Apache, where the witness met with the doctor's appointment. After some forty minutes to one hour at the doctor's office, the witness and defendant then proceeded to a liquor store where they bought and ultimately drank a bottle of wine. After some time the defendant asked the witness to take him to the Osage Shopping Center where he would meet with friends and attempt to borrow money. The defendant asked the witness to park his automobile in an out-of-way place in order that his friends might not see the car in which he was riding so that he might more easily borrow the money. The witness testified that at that time the defendant then left his automobile and the witness stayed behind the driver's seat. He testified the defendant was gone some fif-

teen minutes at which time he saw him approaching the rear of the automobile. The witness further testified that when the defendant returned to the automobile he was carrying a lady's handbag, gold in color. The witness then testified that upon getting into the car, the defendant tossed the handbag into the back seat and that defendant was very excited and said "Let's go, I just shot someone." [Tr. 153] At this time the witness pulled away from the shopping center and soon thereafter noticed that the defendant had a gun in his possession. He then observed the defendant hold the gun out the window of the automobile and work the slide action on the automatic three or four times. The witness then testified that the defendant then put the gun in the seat between them and said, "You go where I tell you, and do what I tell you." [Tr. 156] The witness then testified after going a few blocks that they were stopped by a unit of the Tulsa Police Department. The witness then testified that upon exiting the car, the defendant Cooper stated, "I'm the one you're looking for, I did it." [Tr. 157] The witness testified that soon after being stopped by Officer Higgins, some other officers arrived on the scene and that the defendant and the witness were handcuffed and taken to jail. He then testified that he gave a statement to the police consistent with the testimony in this record. The witness then identified the gold purse as being similar to the one the defendant was carrying when he came back to the car and identified a photograph of a Pontiac Catalina as the automobile he was driving on January 31, 1975. The witness then identified a coat as similar to the coat the defendant was wearing on the date in question. The witness then testified that he had been convicted of a misdemeanor in the State of Illinois and was sentenced to nine months and eighteen days in jail and that subsequent thereto he was convicted of the offense of Carrying a Concealed Weapon in the City of Omaha, Nebraska, at which time he spent thirty days in jail. He testified that since that time he had re-

ceived only traffic citations. The cross-examination concerned the fact that the witness had received medication while at the doctor's office on the day in question and his consumption of wine while in the company of defendant. Cross-examination also concerned the witness' relationship with the sister of the defendant. On further cross-examination it was revealed that the Illinois conviction was originally filed as a felony—Larceny of an Automobile—but was ultimately reduced to a misdemeanor for which the witness served the nine months' incarceration. At this point the State was allowed to recall the victim, Mary Darnold, and she identified the dress she was wearing at the time of the incident and pointed out to the court and jury the bullet holes in said dress. At this time the defendant objected to the testimony concerning the dress, and further objected to the witness' qualifications to testify that the holes in said dress were, in fact, bullet holes.

Finally, the State and defendant were summoned out of the presence of the jury, at which time the court made an inquiry concerning the defendant's willingness to stipulate to the report of the ballistic's expert. After a finding was made by said court that such stipulation was free and voluntary and by agreement a stipulation was entered into whereby a report was offered into evidence indicating that the bullet recovered from the emergency room and the two shell casings were both fired from the pistol seized at the scene of the arrest.

At this time the State rested, the defendant interposed his Demurrer which was overruled, and defendant rested.

■ For his first assignment of error, the defendant asserts that the trial court improperly admitted into evidence objects seized incident to an illegal search and seizure. In support of his argument, defendant raises the issue that the burden is on

the State to prove that a warrantless search is lawful. We find nothing in the record to support the defendant's contention that the State had failed to prove such a search was lawful. The arresting officer had information that a felony had been committed and that the persons or person committing said felony was armed. The officer made said arrest, within some eight or nine minutes after the incident, at a distance not too far from the scene of the crime, and while alone. Both the automobile occupied by the defendant and the description of the defendant himself matched the information given to the officers.

In *Richardson v. State,* 97 Okl.Cr. 370, 264 P.2d 371 (1953), this Court stated, in the third paragraph of the Syllabus:

"Where the officers have information that a felony has been committed, and where they have reasonable grounds to believe the defendant has committed this felony, they may legally arrest him, and evidence obtained in the search of his person, car, or premises after his arrest is admissible against him."

This Court has consistently held that a warrantless search, incident to a lawful arrest, although somewhat limited in scope is not unlawful. See, *Evans v. State,* Okl.Cr., 497 P.2d 460 (1972) and *Davis v. State,* Okl.Cr., 377 P.2d 226 (1963). This Court notes with interest, the argument of the Attorney General, that the defendant failed to both properly raise and perfect his record on his argument that the search and seizure in this case was unlawful. Since we have held that the search was incident to a lawful arrest, based upon probable cause, we find it unnecessary to address ourselves to that argument.

■ For his next assignment of error, defendant urges that the State failed to produce any evidence which would tend to link the defendant with the crime in question. Defendant points out that the victim herself could not identify the assailant and

that the identification was based on that of a third party witness. We hold this assignment to be without merit and find that there was sufficient evidence that a crime was committed and that the defendant could be found guilty thereof in order to submit the same to the jury. In *Himes v. State*, Okl.Cr., 525 P.2d 1244 (1974), this Court once again held:

". . . This Court has consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. . . ."

■ For his third assignment of error, defendant urges that the combined effect of many erroneous evidentiary rulings constituted reversible error. Under this assignment of error the defendant urges several propositions. The defendant first complains about the court allowing an unqualified person to give an opinion. More specifically, that the victim was allowed to testify concerning ballistics and the possible cause of a hole in her dress. At page 182 of the transcript, the trial court allowed the witness to testify that there was a stain where the bullet came out. We simply note that the witness had heretofore testified and demonstrated to the jury the point of egress of the bullet. The witness also identified the dress that she was wearing. It would be absurd to hold that a lay witness could not testify that she was aware she had been shot. It is not calling for expert testimony, as is urged by defendant, for the witness simply to state that the stain on the dress matched the corresponding hole which had recently been in her body.

■ For his second proposition in this regard, the defendant alleges that testimony which called for speculation was admitted over his objections. Once again the defendant urges that the court erred in allowing the witness Miller to testify as to whether or not the defendant had been drinking prior to their first meeting. We note the record also indicates that witness Miller testified as to what observations were made to lead him to form this belief. We hold this called for neither expert nor speculative testimony. This Court has held that a witness need not have particular special knowledge to testify to intoxication, and he may state his reasons for his opinion that defendant was intoxicated, or he may simply state the fact of intoxication. See, *Moran v. State*, 95 Okl.Cr. 6, 237 P.2d 920 (1951); *Templeton v. State*, Okl.Cr., 293 P.2d 696 (1956).

■ For the defendant's next argument under this proposition he urges that the trial court abused its discretion in allowing the State to recall Mrs. Darnold in order that she might identify a dress worn at the time of the incident. The defendant cites no authority from which we can find that this was an abuse of discretion.

■ For his next proposition, the defendant argues that it was improper to allow testimony concerning statements made by the defendant which were not verbatim. After a careful examination of the record in this case, the Court can find no evidence or testimony that indicates the statements made by defendant were not repeated verbatim.

■ The defendant next cites error of the trial court in admitting into evidence photographs of the scene. Defendant further argues that the pictures make it appear to the jury as if the shop were vandalized after the robbery. First of all, the Court would note that the pictures complained of by the defendant were not transmitted to this Court as a part of the record. Secondly, the assumption that the jury viewed the pictures as an act of vandalism following the robbery is that of the defendant as there is no such evidence concerning van-

dalism anywhere in the record. The defendant asserts almost the same argument in this fifth proposition whereby he urges that the court erred in allowing the introduction of the dress worn by the victim at the time of the incident. Once again the defense assumes that the introduction of the dress would imply to the jury that the victim had also been sexually assaulted by the defendant. Once again, there is no evidence in the record to lead this Court to believe that the jury would reach such a conclusion.

In *Bertram v. Harris*, Alaska, 423 P.2d 909, that Court stated:

"The determination of the question as to the admission or exclusion of demonstrative evidence is one within the discretion of the trial judge who has the job of balancing the probative value of the evidence against its dangers of undue prejudice, distraction of the jury from the issues, and waste of time. . . ."

Further, in *Zeigler v. State*, 76 Okl.Cr. 34, 133 P.2d 912 (1943), this Court held in the second paragraph of the Syllabus:

"The introduction of evidence in a criminal case is subject to such restrictions or limitations as the trial court in its discretion may decide."

■ Finally, the defendant urges that while none of these alleged errors in and of themselves rate reversal, the cumulative effect of each together create sufficient prejudice against defendant to require this Court to reverse. Since we hold that each of the above assignments of error to be without merit, it naturally follows that the cumulative effect is not such that requires modification or reversal.

■ For his final assignment of error, the defendant urges that the defendant was not sentenced in accordance with the laws of the State of Oklahoma. Defendant urges that since he was only seventeen years of age at the time of his former con-

victions, that the use of these former convictions to enhance his punishment was in violation of his constitutional rights. Although the defendant cites a case written in 1938 concerning the need to reform juveniles, we assume for the sake of argument, that the defendant is relying on the argument used and holding in *Lamb v. Brown*, 10 Cir., 456 F.2d 18. This Court has previously held that the decision in *Lamb v. Brown*, supra, did not serve to hold as unconstitutional the otherwise valid laws in existence under our Juvenile Code prior to April 4, 1972. In *Dean v. Crisp*, Okl., 536 P.2d 961, this Court, while agreeing with the 10th Circuit's holding that the distinction between males and females was unconstitutional, that the *Lamb* case did not serve to render the previous law totally unconstitutional, and went on to say:

"The record in the instant case reflects that the defendant was above the age of sixteen at the time of his convictions, and it therefore was not necessary to certify him as an adult to stand trial."

Therefore, we hold that the convictions of defendant pronounced against him prior to April 4, 1972, were under the law in effect at that time, constitutional. Therefore, the second trial occurring in 1975, did not serve to prejudice his right under the Constitution of the United States or the State of Oklahoma.

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is, accordingly, *AFFIRMED*.

BRETT, P. J., specially concurs,

BLISS, J., concurs.

BRETT, Presiding Judge (specially concurring).

I concur that the evidence in this case is sufficient to sustain this conviction; and that the sentence is not excessive even absent the after former conviction provision;

however, I reserve my position with reference to *Dean v. Crisp*, supra. But notwithstanding my position with reference to Dean, I believe the facts of this case warrant the sentence imposed.