1997 OK CR 79

**Yancey Lyndell DOUGLAS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–95–834.**

Court of Criminal Appeals of Oklahoma.

Dec. 17, 1997.

652

Frank B. Kirk, Oklahoma City, for Appellant at trial.

Brad Miller, Assistant District Attorney, Oklahoma City, for the State at trial.

Jamie D. Pybas, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, Robert Whittaker, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## OPINION

STRUBHAR, Vice–Presiding Judge:

¶ 1 Appellant, Yancey Lyndell Douglas, was tried by jury and convicted of one count of Murder in the first degree (21 O.S.1991, § 701.7(A)) and one count of Shooting With Intent to Kill (21 O.S.Supp.1992, § 652) in the District Court of Oklahoma County, Case No. CF93–3926, the Honorable Virgil C. Black, District Judge, presiding. The jury found two (2) aggravating circumstances[1] and recommended death for the murder and life imprisonment for shooting with intent to kill. From this Judgment and Sentence, Appellant appeals. We affirm.

## FACTS

¶ 2 Late in the evening on June 24, 1993, Derrick Smith, a Southeast Village Crip gang member, escorted fourteen year old Shauna Farrow home after socializing at the Ambassador Court Apartments in southeast Oklahoma City. As they walked, Smith heard a car approach from behind and watched a gray Datsun two-door hatchback drive by, turn around and approach them driving 10–15 mph. Smith testified the car stopped, the driver's side door opened and Paris Powell, Appellant and an unidentified person(s) opened fire on them. Although he did not see a gun in Appellant's hand, Smith said he saw "fire" coming from Appellant's hand that he knew was gunfire. Smith was shot in the hip and Farrow was shot in the chest and died at the scene. After the gunfire ceased, Smith heard a voice he believed was Appellant's say, "fuck 'em" and the car drove away.

¶ 3 Smith admitted that he had been smoking marihuana and drinking alcohol

---

1. [1] the defendant knowingly created a great risk of death to more than one person; and [2] the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, §§ 701.12(2) and (7).

while he was at the Ambassador Court Apartments that evening, but denied that he was so intoxicated that he could not identify the men who shot him. Smith admitted that he was carrying a .380 automatic weapon which he disposed of before the police arrived, but denied firing it at Powell and Appellant. Smith also maintained that he had not received any favorable treatment from the District Attorney's Office in exchange for his testimony. Smith surmised that the shooting was in retaliation for a prior killing in which a member of Appellant's gang, the 107 Hoover Crips, was killed by a member of Smith's gang.

¶ 4 Prior to the shooting several witnesses saw Appellant talking about committing a drive-by shooting with several other young men at Pitts Park, a park claimed by the 107 Hoover Crips.[2] As the group of boys disbanded, the girls saw Appellant get in the front passenger seat of a bluish/gray two-door hatchback car and fire a nine millimeter gun out the window. Three nine millimeter cartridge casings were found at the scene of the shooting. Lawrence Kuykendoll testified that Appellant brought Powell to his home in the early morning hours of June 25 because Powell had been shot in the hand and needed medical attention. Kuykendoll took Powell to the hospital and saw Appellant leave in a bluish two-door hatchback.

¶ 5 In his defense, Appellant called several witnesses who testified Smith had told them that he could not identify the shooters because it was either too dark or because he was too intoxicated.[3] Appellant also took the stand, against his attorney's advice, and denied any involvement in the shooting. Appellant claimed he was at his mother's selling crack cocaine to raise money to get his car out of the police impound lot and to pay his attorney in an unrelated case.

## ISSUES RELATING TO JURY SELECTION

¶ 6 In his eighth proposition of error, Appellant argues the trial court improperly excused seventeen potential jurors for cause

based on their opposition to the death penalty without first ascertaining whether these prospective jurors could set aside their personal objections and follow the law and the court's instructions. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

¶ 7 "The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown." *Salazar v. State,* 919 P.2d 1120, 1127 (Okl.Cr.1996); *Spears v. State,* 900 P.2d 431, 437 (Okl.Cr.), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995). When this Court reviews the *voir dire* examination of potential jurors who are unclear or equivocal about their ability to consider the death penalty, we traditionally defer to the impressions of the trial court who can better assess whether a potential juror would be unable to fulfill his or her oath. *Scott v. State,* 891 P.2d 1283, 1289 (Okl.Cr.1995), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 784, 133 L.Ed.2d 735 (1996). However, "[r]emoval for cause of even one venire member who has conscientious scruples against the death penalty but is nevertheless able to set aside those scruples and consider the penalty of death and is therefore eligible to serve on the jury is error of constitutional magnitude not subject to harmless error analysis." *Scott,* 891 P.2d at 1289; *Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622, 638 (1987).

¶ 8 During voir dire, the trial court asked prospective jurors substantially the same question, "[i]f selected as a juror and you find that the law and the evidence in this case warrant assessment of the death penalty, could you vote to assess the death penalty?" Fourteen of the seventeen prospective jurors of whom Appellant complains stated unequivocally that they could not assess the death penalty under any circumstances. The remaining three gave equivocal answers before stating unequivocally they could not con-

---

2. *See* Testimony of Ebony Rhone, Ladana Milton and Winter Milton.

3. *See* Testimony of Devin Pope, Joanne Paul, Esi McNeil and Craig Laster.

sider the death penalty under any circumstances. By stating they could not consider the death penalty under any circumstances, the prospective jurors advised the trial court they could not put aside their beliefs and follow the law and the court's instructions. Because the proper inquiry was made by the trial court to determine whether prospective jurors could consider the death penalty, we find no error occurred when the trial court failed to further inquire after receiving unequivocal answers. *See Scott*, 891 P.2d at 1290.

■ ¶ 9 Appellant also argues it was error for the trial court to excuse *sua sponte* these prospective jurors without a motion from the State. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Because Appellant did not object to the removal of the jurors without a motion from the State, he has waived all but plain error. The record shows the prospective jurors' views were such that they could not perform the duties of a juror in this case in accordance with the court's instructions or the oath of a juror and as such they were the proper subject of a challenge for cause. Accordingly, we find no plain error occurred when the trial court removed these jurors for cause without a motion from the State.

■ ¶ 10 Lastly, Appellant argues the trial court erred in removing prospective juror Fundom for cause. As stated above the decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown. *Salazar*, 919 P.2d at 1127; *Spears*, 900 P.2d at 437. "To determine if the trial court properly ruled on a challenge for cause, this Court will review the entirety of the [prospective] juror's voir dire examination." *Salazar*, 919 P.2d at 1127. "To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun." *Id.*

■ ¶ 11 When asked if she could assess the death penalty if the law and the evidence

warranted it, Fundom stated, "I don't know if I could or not. I have a lot of mixed emotions about that." Fundom then qualified her answer stating, "I believe I could, if I felt very strongly." When questioned by the State, Fundom continued to give equivocal answers to questions concerning her ability to consider the death penalty. When questioned by defense counsel, Fundom said she thought the death penalty would be appropriate for someone who "backs a truck up to the Federal Courthouse and blows it down and kills 30 or 40 babies." The trial court then asked:

> Court: Okay. Do your feelings on the death penalty—would your feelings on the death penalty prevent or substantially impair you from the performance of your duty as a juror in accordance with the instructions that I would give you and the decisions you would have to make and after hearing the evidence?
>
> Fundom: Could you repeat that, please?
>
> . . .
>
> Court: Do your views on the death penalty—would your views on the death penalty prevent or substantially impair you from doing your duty as a juror in this case?
>
> Fundom: I guess it's possible.

[The Court explained the seriousness and difficulty of considering the death penalty]

> Court: Okay. How do you feel—with that in mind, okay, considering the difference between I can't do it and I know it would be very difficult but I could if the law and the evidence warranted it and I felt it warranted it, okay. Not I, you felt it warranted it, okay?
>
> Fundom: Right.
>
> Court: Okay. Could you assess the death penalty in this case?
>
> Fundom: When it came right down to it, I don't—I probably wouldn't be able to or I don't—I don't think I would be able to, no.
>
> Court: Okay. Do you think your views on the death penalty would substantially impair you from—from reaching a decision in this case and considering all three possible punishments?
>
> Fundom: I guess it would.

¶ 12 The record shows the trial court questioned Fundom extensively in an attempt to ascertain whether she could consider the three punishment options provided by law. After considering the entire record surrounding the exclusion of Fundom, and giving appropriate deference to the trial court's decision, we find the trial court did not err in excusing Fundom for cause.

¶ 13 In his ninth proposition of error, Appellant argues he was denied his right to a fair trial and reliable sentencing determination when the trial court abused its discretion and refused to conduct individual *voir dire* of prospective jurors. He claims this resulted in a jury panel which was contaminated by opinions of other venire persons. Appellant suggests the prospective jurors were not candid in their responses about the death penalty and simply stated they could not impose the death penalty to avoid jury service.

¶ 14 The record shows that Appellant requested individual *voir dire* in several motions and supporting briefs.[4] At a pre-trial hearing on August 8, 1994, the trial court denied Appellant's motions for individual *voir dire,* but offered to reconsider the request should problems arise during *voir dire.* Defense counsel reurged the motion prior to the commencement of *voir dire* and the trial court denied the motion again offering to reconsider it if a problem arose. Defense counsel never reurged the motion to conduct individual *voir dire* after impaneling of the jury began.

¶ 15 The decision to allow individual *voir dire* of potential jurors is committed to the sound discretion of the trial court and is not a right guaranteed to a defendant. *Hain v. State,* 919 P.2d 1130, 1139 (Okl.Cr.), *cert. denied,* —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996); *Neill v. State,* 896 P.2d 537, 550 (Okl.Cr.1994), *cert. denied,* 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996). This Court has noted that individual *voir dire* is an extraordinary measure that is not typically justified unless there is a danger of exposing potential jurors to damaging information or some other special purpose. *Hain,* 919 P.2d at 1139.

¶ 16 In the instant case, individual *voir dire* was not warranted. There is nothing in the record to indicate that the jurors were less than candid in their responses concerning the death penalty or that their responses to questions about the death penalty were given to avoid jury service. This Court recognizes the difficulty it may have in conducting a review regarding a juror's willingness to be candid with a court. Therefore, we place great weight on the trial court's opinion of the jurors. *Id.* at 1139. Here, the trial court, who saw the prospective jurors and heard their responses firsthand, found no need to individually or privately *voir dire* them. Because there is no evidence Appellant was prejudiced by that decision, we find the trial court did not abuse its discretion in denying the motion for individual *voir dire.*

## ISSUES RELATING TO GUILT/INNOCENCE

¶ 17 In his first proposition of error, Appellant argues the State improperly impeached him with evidence of prior bad acts. He claims that because the trial court allowed the State to impeach him with specific instances of unadjudicated and juvenile conduct to rebut his statement on direct examination that he was not a violent person, the jury convicted him based on this propensity evidence rather than on evidence of guilt.

¶ 18 At trial, Appellant took the stand and testified in his own defense. Near the end of direct examination by defense counsel, Appellant denied he was a leader of the 107 Hoover Crips and told the jury his street name was "Baby Hoover." Defense counsel commented that the name "Baby Hoover" was not the name one would expect a gang leader to possess. He then asked Appellant about other gang members' street names such as "Blood Killer" and "Killer" Highshaw and stated:

> Defense Counsel: Your name doesn't seem to be—reflect violence in the way those do.

> Appellant: No, but that's—my name is—I don't represent my name to be—violent. *I*

4. O.R. 66–71, 91–92, 116–18, 147–49.

*wasn't no violent person.* (Tr. 1600) (emphasis added)

¶ 19   On cross-examination, the prosecutor asked Appellant about his statement that he was not a violent person:

Prosecutor: Well, you said you weren't a violent person. I heard you say that on direct testimony. I heard you say you were not a violent person, right?

Appellant: Well, what I really mean that I ain't never been convicted of—

Prosecutor: My question is—oh, you haven't been convicted?

Appellant: Convicted of no violent crime. (Tr. 1641)

¶ 20   The prosecutor then asked Appellant if you commit a murder for which you are not convicted does that mean you did not commit the murder or that you are not a violent person. Appellant somewhat evaded the question, responding that he had never killed anyone. When the prosecutor persisted with the question, defense counsel objected claiming the question was argumentative and confusing to Appellant who had an IQ of 70. The trial court overruled the objection stating that Appellant had opened the door with his statement that he was not a violent person. Appellant continued to answer that he had never killed anyone. The prosecutor then asked:

Prosecutor: Mr. Douglas, do you recall saying that you weren't a violent person, right? Do you remember that?

Appellant: Well, I ain't never been convicted of any violent crime.

Prosecutor: So you finally answered my question then. In your mind, you're not a violent person if you haven't been convicted, correct?

Appellant: Shoot, haven't been convicted (inaudible). Some people might be, I don't know, defending theirself or something and then they think they're violent or something. I don't know. You know what I'm saying. If I'm defending myself or not.

Prosecutor: Do you consider it a crime of violence, Mr. Douglas, to stick a gun in someone's head, in the back of the head? Do you consider that to be a violent crime?

Appellant: I think, shoot, I think it is. I really don't got the law down pat, so I really don't know. I really don't know. (Tr. 1645–46)

¶ 21   Defense counsel objected arguing that the question injected impermissible evidence of other crimes and was irrelevant. The trial court overruled the objection again finding that Appellant had opened the door by stating that he was not a violent person. The prosecutor then questioned Appellant about a specific instance stating, "All right now, Mr. Douglas, you committed your first armed robbery or robbery—." Defense counsel objected arguing the State should not be allowed to impeach Appellant with an unadjudicated offense and juvenile matters. The State argued the impeachment evidence was proper under 12 O.S.1991, §§ 2404, 2405 and 2608 to show that Appellant was lying when he said he was not a violent person. The trial court, relying on section 2404(A), overruled the objection. The prosecutor then asked Appellant about nine specific instances of unadjudicated or juvenile conduct to show that Appellant was lying when he said he was not a violent person.[5] All objections were overruled.

¶ 22   First, Appellant claims that he did not intentionally place his character at issue and did not open the door to questions about

---

**5.**   The first incident involved an alleged unadjudicated armed robbery in 1990. (Tr. 1657) The second incident involved an alleged unadjudicated strong armed robbery when Appellant was nine to eleven years old. (Tr. 1658) The third incident involved an alleged unadjudicated shooting on March 12, 1991. (Tr. 1659–1662) The fourth incident involved an alleged unadjudicated drive-by shooting in October 1991. (Tr. 1663–64) The fifth incident concerned an altercation with an Oklahoma City Housing Authority Officer on February 8, 1992. (Tr. 1664–65) The

sixth incident involved a gang altercation at Crossroads Mall on March 7, 1992. (Tr. 1665–67) The seventh incident involved an allegation that Appellant was arrested on February 21, 1993 with drugs on his person and a gun in his car. (Tr. 1667–69) The eighth incident involved an allegation that Appellant was involved in a drive-by shooting on May 30, 1993. (Tr. 1669–71) The final incident alleged Appellant was involved in altercations in the county jail, including an assault on a guard. (Tr. 1673–74).

his violent character to rebut his statement that he was not a violent person. Appellant frames the issue before this Court as "whether [Appellant's] unresponsive answer to defense counsel's comment about his gang name on direct examination was an advertent attempt to place his character 'at issue.' "[6]

¶ 23 Title 12 O.S.1991, § 2404(A)(1) provides:

A. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

1. Evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same. . . .

■ ¶ 24 Section 2404(A)(1) is the "codification of the common law rule that initially prohibits the prosecution from introducing evidence of bad character to establish the probability of guilt, but permits the introduction of evidence of good character by the accused after which it may be rebutted by the prosecution. . . . [I]f the accused chooses to open the door to the use of good character in resolving the probabilities of guilt, then, in fairness, the prosecution may rebut the evidence of good character with evidence of bad character." 2 Leo Whinery, Oklahoma Evidence, Commentary on the Law of Evidence, § 15.07 (1994). In other words when a criminal defendant puts his character at issue, the State may, on cross-examination or rebuttal, introduce evidence of bad character. *Walters v. State*, 848 P.2d 20, 23 (Okl.Cr.1993). Further, once the accused takes the stand and places his character in issue on direct examination, "[i]nquiry is allowable on cross-examination into relevant specific instances of conduct." 12 O.S.1991, § 2405(A); *see also Thomason v. State*, 763 P.2d 1182, 1184 (Okl.Cr.1988).

■ ¶ 25 In the instant case Appellant volunteered unequivocally that he was not a violent person. This statement opened the door and invited inquiry into prior bad acts to test the veracity of his statement and the defense's insinuation that Appellant was not a violent person because his gang name did not personify violence. As we have said, such "[r]ebuttal evidence 'may be offered to explain, repel, disprove, or contradict facts given in evidence by an adverse party, regardless of whether such evidence might have been introduced in the case in chief or whether it is somewhat cumulative.' " *Quilliams v. State*, 779 P.2d 990, 992 (Okl.Cr.1989)(*quoting Hall v. State*, 698 P.2d 33 (Okl.Cr.1985)). Therefore, it was not error to impeach Appellant with evidence of his prior bad acts after he voluntarily put his character in issue.

¶ 26 Second, Appellant argues the scope of the State's impeachment exceeded permissible bounds and violated his right to a fair trial. Appellant contends that by clarifying on cross-examination that he meant to say that he had not been convicted of any violent crime rather than he was not a violent person, he effectively withdrew the issue of his character and the prosecutor should have been estopped from impeaching him with prior bad acts.

■ ¶ 27 Appellant fails to cite specific relevant authority that an accused may put his character in issue and then withdraw the character issue thereby limiting impeachment. Failure to support an argument with relevant authority waives the issue on appeal unless this Court finds plain error. This Court finds the scope of impeachment evidence to rebut a defendant's evidence of good character must be specific and must relate directly to the particular character trait a defendant offers in his own behalf. In the instant case, Appellant put in issue his character for non-violence and the State impeached him with specific instances of prior violent conduct. Because the scope of the State's rebuttal related directly to Appellant's character for non-violence, no plain error occurred.

■ ¶ 28 Next, Appellant contends that the prosecution's impeachment evidence should have been limited to character evidence that falls within the exceptions in 12 O.S.1991, § 2404(B).[7] Relying on Whinery,

6. Brief of Appellant at 18.

7. 12 O.S.1991, § 2404(B) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person

Appellant argues inquiry into relevant specific instances of conduct allows the cross-examiner of the character witness to test the accuracy of what the character witness has heard and reported. Because a defendant will typically have knowledge of his or her prior acts, impeaching a defendant with prior bad acts does little to test the knowledge of the defendant/witness on cross-examination. As such, Whinery and Appellant contend the testimony of a defendant on cross-examination with respect to his own commission of prior crimes is admissible only if the crimes tend to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. 2 Leo Whinery, Oklahoma Evidence, Commentary on the Law of Evidence, § 15.08 at 325.

¶ 29  Appellant relies on § 15.08 in which Professor Whinery criticizes this Court's decision in *Thomas v. State,* 741 P.2d 482 (Okl. Cr.1987). In *Thomas,* the defense called character witnesses to testify about the defendant's good reputation. The defendant took the stand, but did not testify as to his own character. The trial court allowed the prosecution to impeach the defendant with specific instances of prior crimes to rebut the character witnesses' testimony. This Court upheld the trial court based on its interpretation of 12 O.S.1991, § 2405(A) which allows inquiry on cross-examination into relevant specific instances of conduct to prove character.

¶ 30  This Court need not address Professor Whinery's criticism as the instant case differs from *Thomas* in that Appellant through his own testimony put in issue his character for non-violence. The State impeached Appellant with specific instances of prior violent acts in an effort to test his knowledge of the statement. Such cross-examination was in conformity with 12 O.S. 1991, § 2405(A) and Whinery's position that the purpose of section 2405(A) is to allow the cross-examiner of a character witness to test the accuracy of what the character witness has heard and reported. Moreover, as the State points out, section 2404(B) places limits on the proponent of character evidence but does not address the method of proving character evidence. Because the State properly impeached Appellant with specific instances of conduct to test the accuracy of his statement, we find no error and decline to hold that such evidence must fall within one of the exceptions listed in section 2404(B).

■ ¶ 31  Fourth, Appellant argues the State should not have been allowed to cross-examine him concerning acts which merely resulted in arrests rather than convictions or to cross-examine him about juvenile offenses. We first address whether a defendant who puts his character in issue can be cross-examined with specific instances of conduct that resulted in mere arrests and not convictions. Appellant asks this Court to apply its holding in *McDonald v. State,* 764 P.2d 202, 206 (Okl.Cr.1988) to the instant case. In *McDonald,* this Court reviewed 12 O.S.1981, § 2608(B)(1) [8] which permits a witness to be cross-examined with specific instances of the witness's conduct other than conviction of a crime. The *McDonald* court held that arrests were not specific instances of conduct for purposes of § 2608 and that a witness's prior arrests could not be used to impeach a witness's credibility. *McDonald,* 764 P.2d at 206. The State argues that the prosecution in the instant case was not impeaching Appellant with the fact that he had been arrested but with specific instances of violent conduct to rebut his assertion that he was not a violent person.

¶ 32  Neither the parties' research nor this Court's has revealed any Oklahoma case on point. Missouri has addressed this point and concluded that a defendant who places his character in issue invites inquiry into

in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

**8.**  Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Section 609 of this Code, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness if they:

1.  Concern his character for truthfulness or untruthfulness.

mere arrests or investigations not resulting in conviction. *State v. Collier*, 892 S.W.2d 686, 690 (Mo.App. W.D.1994); *State v. Parson*, 815 S.W.2d 106, 109 (Mo.App.1991).

> Where the defendant in direct examination voluntarily opens up the subject that he is a person of good character and testifies that he has never been in any "trouble" before and hence is less likely to commit a crime than a person not of good character, it is permissible for the state to attempt to impeach the defendant's efforts to present to the jury a record of previous good conduct by showing prior arrests or criminal charges for the purpose of testing (a) whether he truthfully is a person of good character and (b) his trustworthiness and credibility as a witness in his own behalf.

*State v. Macon*, 547 S.W.2d 507, 514 (Mo. App.1977).

¶ 33 We find Missouri's approach to this issue persuasive. As long as the conduct precipitating the arrest impeaches the character trait offered by the defendant, as it did in this case, the jury is presented with a complete picture. It is the conduct giving rise to the arrest that serves to impeach the defendant, not the fact that the defendant was arrested.

¶ 34 Next, we must address whether a defendant who puts his character in issue can be cross-examined with juvenile offenses. Again, this Court has found no Oklahoma cases on point.

> Title 10 O.S.Supp.1993, §§ 1125.4(F) and (G) [9] provide in relevant part: 1. A record of any child alleged or adjudicated to be delinquent pursuant to this title, or any evidence given in such cause, or any records sealed pursuant to this section, shall not in any civil, criminal or other cause or proceeding in any court be lawful or proper evidence against the child for any purpose whatever, except as provided by this subsection. Unsealed records of a person alleged or adjudicated to be delinquent may be inspected without a court order, and the court shall issue an order unsealing sealed records, for use for the following purposes:

> 1. In subsequent cases against the same child pursuant to this title;

> 2. In an adult criminal proceeding pursuant to Sections 1104.2 and 1112 of Title 10 of the Oklahoma Statutes;

> 3. Upon conviction of a criminal offense in an adult proceeding, in connection with the sentencing of such person. . . .

> G. Records of a delinquency proceeding may be used to show the bias, if any, should the person who is the subject of the records be a witness in a civil or criminal proceeding either while a child or after he becomes an adult. . . .

The Oklahoma Evidence Code provides:

> Evidence of juvenile adjudications is not admissible under this Code. The court in a criminal case may, however, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

12 O.S.1991, § 2609(D).

¶ 35 Although Appellant was questioned about the 1985 strong armed robbery for which he received a deferred adjudication, the questions on cross-examination were not designed to elicit matters pertaining to any juvenile proceedings. Accordingly, the protection of the Juvenile and Evidence Codes does not apply. While a defendant may not be impeached by showing he has been convicted of a criminal offense in a juvenile court, he may be impeached by questions to which the answers affect his credibility as a witness albeit the questions relate to activities when the defendant was a juvenile. *Collier*, 892 S.W.2d at 691. In other words, the State, as it did in this case, may ask a defendant about his prior conduct, but not about the juvenile proceeding that followed.

¶ 36 Lastly, Appellant claims the trial court abused its discretion when it allowed the State to impeach him with specific in-

9. This section was renumbered July 1, 1995 and was codified at 10 O.S.Supp.1995, § 7307–1.7(F) and (G). In 1996 these provisions were removed.

stances of prior criminal conduct. He argues such character evidence should have been excluded because its prejudicial impact far outweighed any probative value since it showed Appellant had committed other crimes including other drive-by shootings. Because Appellant failed to object at trial based on 12 O.S.1991, § 2403, we will review for plain error. *Hill v. State*, 898 P.2d 155, 164 (Okl.Cr.1995).

■ ¶ 37 Although this evidence certainly touches on other crimes, it is admissible as long as its probative value is not substantially outweighed by the danger of unfair prejudice. 12 O.S.1991, § 2403. When a defendant puts a trait of his character in issue, the State may admit evidence to contradict and impeach him concerning that trait subject to the rules of relevancy. *See Walters*, 848 P.2d at 23. As we stated in *Mayes v. State*, 887 P.2d 1288, 1309–10 (Okl. Cr.1994), *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995):

> In dealing with the relevancy of evidence, we begin with the presumption that in determining whether to admit such evidence, the trial judge should lean in favor of admission. The burden is on the party opposing its introduction to show it is substantially more prejudicial than probative. When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. (citations omitted).

■ ¶ 38 Balancing the prejudicial effect and probative value of evidence lies within the sound discretion of the trial court whose decision will not be disturbed unless an abuse of discretion is shown. *Cooper v. State*, 552 P.2d 406, 414 (Okl.Cr.1976). In this case the trial court did not put its bal-

ancing decision on the record since Appellant did not object on that basis. However, a review of the record shows that Appellant opened the door to the evidence of bad character through his statement that he was not a violent person. The trial court properly instructed the jury that such evidence could not be used as evidence of guilt, but only as impeachment. Therefore, such evidence was not so prejudicial that it should have been excluded. Because the impeachment evidence was relevant and not so prejudicial that it should have been excluded under section 2403, we find the trial court did not abuse its discretion. In the absence of an abuse of discretion, Appellant fails to establish plain error. As such, this proposition is denied.

¶ 39 In his second proposition of error, Appellant contends the trial court abused its discretion in admitting extrinsic evidence to impeach Craig Laster's bias or credibility because the State failed to lay a proper foundation for admission of extrinsic evidence.

¶ 40 Prior to trial, defense counsel approached Derrick Smith, the surviving victim, and gave him a note and audiotape message from his cousin and fellow gang member, Craig Laster.[10] In the written note admitted as State's Exhibit 42, Laster told Smith to tell the truth on the stand because he should not "be snitching." [11] Laster also told Smith to say that he could not identify his shooters because they had on ski masks or because he couldn't see their faces.

¶ 41 At trial, the prosecutor asked Smith about defense counsel's visit. Defense counsel objected, arguing the line of questioning was beyond the scope of cross-examination, that the letter went to the credibility of Laster and that there was no evidence Appellant had any knowledge of his meeting

---

**10.** At the beginning of trial, the prosecutor advised the court about the note and audiotape and demanded that defense counsel produce them. (Tr. 36–37) Defense counsel advised the audiotape no longer existed. Conveniently, counsel had taped over it in another interview. Counsel advised he believed he had the note and agreed to produce it. (Tr. 38) Defense counsel admitted visiting Smith, but denied any improper motives or attempts to intimidate. (Tr. 39, 42)

**11.** The note said:

> Hey, D-hop, homie, I'm writing you to tell you to tell the truth on the stand. Dhop, cuzz I love you with all my heart, but cuzz you don't need to be snitching know matter what it is. So just tell them that the people who was shooting at you had on ski mask or you just couldn't see there face. Peanut.

with Smith. The trial court overruled the objection noting there was a "credibility situation and impeachment on cross examination goes to that area." Smith then testified defense counsel came to the county jail the Thursday before trial, gave him a note written by Laster and played a tape recording from Laster telling Smith if he was going to be in a gang, he should not testify against other gang members and that he should settle his problems on the street. In the defense's case-in-chief, Laster testified he wrote the note to encourage Smith to tell the truth, not to scare him. The prosecution questioned Laster extensively about the note.

¶ 42 First, Appellant correctly argues that extrinsic evidence could not be used to impeach Laster's veracity because 12 O.S.1991, § 2608(B) prohibits the use of extrinsic evidence to impeach a witness with specific instances of conduct to attack or support the credibility of the witness. However, the State maintains that Smith's testimony concerning Laster's attempts to influence his testimony was offered to prove Laster's bias.[12]

¶ 43 Appellant concedes based on the record that Smith's testimony could have been offered to prove bias and as such recognizes the right to cross-examine a witness concerning his credibility to expose bias, prejudice or motivation. However, he argues that extrinsic evidence to prove bias can only be introduced after the witness takes the stand and denies the conduct which would expose a bias. Appellant complains that Smith was allowed to testify about Laster's attempt to influence his testimony before Laster's credibility was at issue. Appellant argues the State should have been forced to wait until Laster took the stand and his credibility was at issue. If Laster denied writing the note or making the tape, Appellant contends then the State could have called Smith in rebuttal to testify about the note and tape recording.

¶ 44 It is true that a party may not impeach a witness with extrinsic evidence to show bias until the witness has testified as such evidence serves to rebut the witness's testimony and attack the witness's credibility. *See* McCormick on Evidence §§ 47 and 49 (1992). *Cf.* 12 O.S.1991, § 2608(A)(2)(evidence of truthful character is admissible only after witness's character has been attacked). In other words, evidence used to impeach or enhance the credibility of a witness is irrelevant when the credibility of the witness has not been attacked or put in issue. Accordingly, the trial court erred in allowing the State to question Smith about Laster's note and audiotape before Laster testified.

¶ 45 We must now decide if relief is required. A conviction should not be set aside for insubstantial errors for a defendant is not entitled to a perfect trial only a fair one. *McCarty v. State*, 765 P.2d 1215, 1217 (Okl.Cr.1988); *Barnhart v. State*, 559 P.2d 451, 459 (Okl.Cr.1977). In the case of evidentiary error, the proper inquiry is whether this Court has "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred. *Hill*, 898 P.2d at 164.

¶ 46 Appellant argues that he was prejudiced because Laster admitted writing the letter and making the audiotape and therefore no extrinsic evidence should have been admitted to rebut the admission. As Professor Whinery notes:

> If, in the unlikely event that the witness should completely admit the facts from which the bias proceeds, the examiner should ordinarily be foreclosed by the trial judge ... from introducing extrinsic evidence. Otherwise, the central issues in the case may be obscured with the tangential inquiry into the issue of bias. However, if the witness denies or does not fully admit the facts underlying the claim of bias, the examiner has the right to prove those facts by extrinsic evidence.

12. "Bias denotes a relationship between a party and a witness that may cause the witness to slant testimony, either consciously or unconsciously, either for or against a party....Bias may involve favoritism, animosity, or self-interest. Except in the rare case where a witness admits that his testimony will be affected by one or the other of these feelings toward a party, bias is evidenced through indirect, or circumstantial, evidence such as relationships, conduct, or utterances." 3 Leo Whinery, Oklahoma Evidence, Commentary on the Law of Evidence, § 47.08 at 340.

3 Leo Whinery, Oklahoma Evidence, Commentary on the Law of Evidence, § 47.08 at 341 (1994).

¶ 47 In the instant case, Laster admitted that he was Smith's cousin and Appellant's friend, that he was a gang member, that gang members settle their own problems and don't testify against one another, that he wrote the note to Smith and recorded the message. Laster further testified that he wrote the note because Smith was lying and he did not want an innocent person to go to jail.

¶ 48 Because Laster admits all the facts from which his bias could be inferred, the use of extrinsic evidence to show bias should have been prohibited or extremely limited. However, we find relief is not required. Although the evidence was immaterial at the time it was admitted, it was simply cumulative given Laster's admissions and did not contribute to the verdict because such evidence dealt with Laster's credibility not Appellant's guilt.

¶ 49 Next, Appellant argues that the evidence of Laster's attempt to influence Smith's testimony was not restricted to impeachment evidence by appropriate instruction and that such error was compounded by the prosecutor's argument that the evidence could be used as circumstantial evidence of Appellant's guilt. Appellant entered a general objection to the trial court's instructions and did not request an instruction concerning the use of Laster's attempt to influence Smith's testimony. Further, Appellant did not object to the prosecutor's statements about which he now complains. Failure to object to the instructions administered and request specific instructions and failure to object to the prosecutor's argument waives the error on appeal unless this Court finds plain error. *Hill,* 898 P.2d at 163; *Hammon v. State,* 898 P.2d 1287, 1307 (Okl.Cr.1995).

¶ 50 Oklahoma has long held that a defendant's attempt to influence witnesses not to testify or to testify falsely is relevant and may be admitted as an admission by conduct and considered on the issue of guilt. *Gideon v. State,* 721 P.2d 1336, 1338 (Okl.Cr.1986) and cases cited therein. Evidence of such attempts by a third person is not admissible where there is no evidence or proof to connect the accused therewith. *Stuart v. State,* 35 Okl.Cr. 103, 109, 249 P. 159, 161 (1926). Before attempts by a third person to influence a witness not to testify or to testify falsely can be admitted as substantive evidence of guilt, it must be shown that such attempts were done with the authority, consent or knowledge of the defendant. *Stuart,* 249 P. at 161.

¶ 51 Neither the State nor Appellant challenge the validity of these principles. However, the State argues that the nature of the attorney/client relationship between Appellant and defense counsel was sufficient to impute knowledge of defense counsel's meeting with Laster and Laster's attempt to influence Smith's testimony to Appellant. In effect, the State contends the existence of an attorney/client relationship, by itself, is sufficient to show that Appellant authorized counsel to solicit Laster to influence Smith's testimony.

¶ 52 Although authorization by the accused may be proved by direct or circumstantial evidence, the fact that the accused and the third party share a particular relationship, such as familial relationship, friendship or employment relationship, cannot be adequate proof by itself to prove authorization. *See Saunders v. State,* 28 Md. App. 455, 346 A.2d 448, 451 (1975). In this record there is no evidence Appellant knew defense counsel asked Laster to tell Smith to tell the truth much less asked Laster to tell Smith to testify falsely.[13] The State offers nothing more than the fact Appellant was represented by defense counsel to prove au-

---

13. At trial defense counsel advised the trial court he and his investigator took Laster's note and audiotape recording to Smith without Appellant's knowledge. (Tr. 880, 1838, Sent.4–5) Defense counsel stated the only request he made of Laster was to tell Smith to testify truthfully on the stand. (Tr. 39, 46–50, 1838) Laster testified Ap-

pellant never asked Smith not to testify and that defense counsel asked him to tell Smith to tell the truth. (Tr. 1547, 1553, 1569, 1572, 1575) Laster claimed he was responsible for the content of the note to Smith and emphasized that defense counsel only asked him to tell Smith to tell the truth. (Tr. 1575–76).

thorization. We find that the attorney/client relationship, without more, is insufficient to use a third party's efforts to tamper with witnesses as evidence of an accused's guilt. We continue to require additional evidence tending to connect the defendant with efforts to tamper with the witness. *Stuart,* 249 P. at 161. Accordingly, Laster's attempt to influence Smith's testimony could not be used as substantive evidence of guilt, but only for impeachment to show bias.

■■■ ¶ 53 This Court must decide whether the lack of instruction on the use of Laster's testimony and the prosecutor's remarks constitute plain error. The proper inquiry again is whether this Court has "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred. *Hill,* 898 P.2d at 164. In the instant case, the trial court administered instructions on the use of other crimes evidence, prior inconsistent statements as impeachment evidence, prior convictions as impeachment evidence, and that an attorney has the right to interview witnesses.[14] During closing argument, defense counsel argued that such evidence had nothing to do with Appellant's guilt while the prosecutor argued that Appellant intimidated witnesses.

¶ 54 The record shows that the evidence against Appellant was strong, but part of its strength depended on the credibility of Smith. We cannot ignore that the evidence of attempted tampering bolstered Smith's credibility. However, there was appreciable circumstantial evidence linking Appellant to the murder. As discussed above, several witnesses placed Appellant at Pitts Park shortly before the murder talking about committing a drive-by shooting on the south side and firing a nine millimeter gun out of the window of the two door gray hatchback. Shortly after the shooting Appellant drove Powell, who was suffering from a gunshot wound to the hand, to Lawrence Kuykendoll's house so Kuykendoll could take Powell to the hospital. The following morning Appellant returned the car used in the drive-by

shooting to Leon Washington who had loaned it to Powell. Further, Appellant admitted he initially lied to police about his alibi. Given the above evidence connecting Appellant with the murder without Smith's identification, we find that the lack of instruction and the prosecutor's remarks concerning Laster's attempt to influence Smith did not amount to plain reversible error.

■■■ ¶ 55 Lastly, Appellant argues this evidence should have been excluded because it was far more prejudicial than probative. 12 O.S.1991, § 2403. This Court will not disturb a trial court's decision to admit evidence absent a clear abuse of discretion accompanied by prejudice. *H.W. v. State,* 759 P.2d 214, 218 (Okl.Cr.1988). Because the evidence was cumulative and did not prejudice Appellant, we find no relief is warranted.

■■■ ¶ 56 In his third proposition of error, Appellant complains the trial court abused its discretion when it overruled his motion for a continuance. The decision to grant or deny a motion for continuance is addressed to the sound discretion of the trial court whose decision will not be disturbed unless an abuse of discretion is proved. *Jones v. State,* 917 P.2d 976, 978 (Okl.Cr. 1995). This Court has reversed capital cases upon finding the trial court abused its discretion when it failed to grant a continuance. *See Jones,* 917 P.2d at 979–80; *Marquez v. State,* 890 P.2d 980 (Okl.Cr.1995).

¶ 57 In the instant case, the State endorsed the same thirty-four (34) witnesses on the original and amended Informations.[15] Appellant subsequently filed a motion for discovery and inspection which was sustained.[16] In three orders dated May 1, 1995, May 16, 1995 and May 25, 1995, the State endorsed one hundred seven additional witnesses.[17] On June 8, 1995, the State filed its first stage witness list containing seventy witnesses and its second stage witness list containing one hundred forty witnesses.[18] Of the sixteen witnesses called in first stage,

14. O.R. 407, 409, 413, 414.

15. O.R. 2–3, 30–31.

16. O.R. 10–18; 08/04/94 Mot. Hrg. at 7.

17. O.R. 184, 194, 201.

18. O.R. 312–316; 304–311.

seven were endorsed on the original Information and the remaining were endorsed in the May 1, 1995 order. Of the sixteen witnesses called in second stage, one was endorsed on May 1, 1995, thirteen were endorsed on May 16, 1995 and the two victim impact witnesses were endorsed on May 25, 1995.[19] Also on June 8, 1995, the State filed a summary of its first stage witnesses' testimony which included all but one of the witnesses called in first stage.[20] The one witness who was not listed in the summary testified at the preliminary hearing. On May 16, 1995, the State filed a More Definite and Certain Statement of the Allegations Set Forth in the Bill of Particulars In Re Punishment which included a summary of all the State's second stage witnesses who testified at trial except the two victim impact witnesses.[21] The victim impact witnesses' summaries were filed May 25, 1995.[22]

¶ 58 Defense counsel filed a motion for continuance on June 12, 1995, arguing that counsel could not adequately interview and prepare for trial due to the volume of newly endorsed witnesses.[23] At the hearing on the motion for continuance, counsel argued that the addresses listed for the witnesses were inaccurate and that he had not been provided with background checks on State's witnesses. The defense's investigator testified that out of the 9 to 11 witnesses he had tried to locate, six had correct addresses.[24] The trial court overruled the motion for· continuance noting the motion was not supported by appropriate affidavit and that there had been more than adequate time to prepare.[25] At the beginning of trial defense counsel noted that he had refiled his motion for continuance alleging the same grounds with a supporting affidavit.[26] The trial court overruled the mo-

tion without comment.[27] Defense counsel refused to announce ready at the start of trial and stood on the record previously made.[28] Throughout the trial, defense counsel did not object to any State's witness on the basis that he had not been able to locate or interview the witness prior to trial.

■■■ ¶ 59 In the instant case we find there is no evidence the trial court abused its discretion in denying the motion for continuance. While the prosecutor endorsed more witnesses than he intended to call at trial in violation of Okla. Const., Art. 2, § 20, such violation does not warrant automatic reversal. *Dennis v. State*, 879 P.2d 1227, 1230 (Okl.Cr.1994). The record in the instant case shows counsel filed for and was provided in a timely fashion with the names of all witnesses who testified at trial and a summary of their testimony. *Allen v. District Court of Washington County*, 803 P.2d 1164, 1167 (Okl.Cr.1990), *modified in, Richie v. Beasley*, 837 P.2d 479, 480 (Okl.Cr.1992).[29] Further, Appellant does not claim on appeal, nor does the record show, that he was surprised or otherwise unprepared to meet the evidence presented at trial. Accordingly, we find the trial court did not abuse its discretion in overruling Appellant's motion for continuance.

¶ 60 Appellant also argues the State did not comply with the trial court's discovery order and the trial court should have precluded the State from calling any of its thirty-one witnesses. After listening to argument, the trial court overruled the motion for continuance and ordered the case to proceed to trial. The trial court made no specific finding that its discovery order had been violated. By its ruling, the trial court appar-

---

19. O.R. 2–3, 184, 194, 201.

20. O.R. 299–303.

21. O.R. 187–193.

22. O.R. 199–200.

23. O.R. 317.

24. 06/16/95 Mot.Hrg. at 45.

25. 06/16/95 Mot.Hrg. at 70–72.

26. Tr. 5. However, this motion for continuance with supporting affidavit does not appear in the original record.

27. Tr. 5.

28. Tr. 52.

29. Defense counsel filed his discovery motion pursuant to this Court's decision in *Allen*. The trial court sustained the motion pursuant to *Allen*. While this case was pending, the discovery code was enacted. 22 O.S.1994, § 2002.

ently found the State had complied with its discovery order and complied with the applicable notice and endorsement provisions. Okla. Const., art. 2, § 20; 22 O.S.1991, § 303. As such, the trial court correctly declined to impose any type of sanction. *Jones v. State,* 899 P.2d 635, 642–43 (Okl.Cr.1995), *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (1996). Because there is no evidence the trial court abused its discretion, this proposition is denied.

¶ 61  In his fourth proposition, Appellant claims Instruction No. 4 [30] allowed the jury to find him guilty without finding as is required by law that he possessed the intent to kill, i.e. malice aforethought. *Cannon v. State,* 904 P.2d 89, 99 (Okl.Cr.1995), *cert. denied,* 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996). Because Appellant failed to object and submit alternative instructions, this Court will review the Instruction No. 4 for plain error. *Johnson v. State,* 928 P.2d 309, 315 (Okl.Cr.1996).

¶ 62  The trial court administered a modified version of OUJI–CR–427. The trial court modified the third element stating, "the death was caused by the Defendant or by a person for whom the Defendant was criminally responsible." Appellant argues the jury could have interpreted the phrase "or by a person for whom the Defendant was criminally responsible" to mean Appellant did not have to possess the intent to kill if Farrow's death was caused by one of his co-defendant's malice and the death was aided by Appellant. Appellant maintains such error was not corrected by the other instructions.

¶ 63  A review of the instructions as a whole shows the jury was correctly instructed on the element of malice aforethought, the definition of malice aforethought and the State's burden of proof. The jury was specifically instructed that it could consider the external circumstances surrounding the commission of the homicidal act in finding whether or not **deliberate intent existed in the mind of the Defendant to take a human life.** (emphasis added). Because the instructions as a whole sufficiently informed the jury that it had to find Appellant possessed the intent to kill Farrow even if it found Appellant aided and abetted in her killing rather than actually caused her death, we find no plain error.

¶ 64  In his fifth proposition of error, Appellant argues that the first stage aiding and abetting instructions improperly advised the jury that the intent element necessary to find one guilty as an aider and abettor is general criminal intent rather than the specific intent required for the crime charged. Appellant contends that under these instructions, a person with no personal malice aforethought, who nonetheless harbors a general criminal intent, can be found guilty of malice murder as an aider and abettor so long as the person being aided possessed the requisite malice aforethought. Appellant concedes this argument was rejected in *Cannon,* 904 P.2d at 99, but urges this Court to reconsider it as it relates to the penalty phase. Essentially, Appellant argues the trial court erred in failing to instruct the jury in the punishment stage of trial that he could not be sentenced to death for murder by an accomplice unless the jury found he killed Farrow, intended that Farrow be killed, intended that lethal force be used or acted with reckless indifference to human life. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding an individual cannot be sentenced to death for **felony** murder by an accomplice unless the jury finds the defendant killed the victim, intended that the victim be killed, intended that lethal force be used or acted with reckless indifference to human life). Because this was a malice murder case and the jury found Appellant acted with malice aforethought, an *Enmund/Tison*

---

**30.** Instruction No. 4 provides:
No person may be convicted of Murder in the First Degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:
*First,* the death of a human;
*Second,* the death was unlawful;
*Third,* the death was caused by the Defendant or *by a person for whom the Defendant is criminally responsible;*
*Fourth,* the death was caused with malice aforethought.
(O.R.399) (emphasis added)

instruction was not warranted. *Cannon*, 904 P.2d at 105. Accordingly, we find no error.

¶ 65 In his sixth proposition, Appellant argues the evidence was insufficient to sustain his convictions. He contends the State failed to prove that he actually fired the shots at Farrow and Smith or that he aided and abetted the shooter with the specific intent to kill Farrow. "Because the evidence presented at trial was both direct and circumstantial, the test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Barnett v. State*, 853 P.2d 226, 231 (Okl.Cr.1993).

¶ 66 "In order for an accused to be convicted as a principal in a crime, it must be [proved] that he directly committed each element of the offense, or that he aided and abetted another in its commission." *Barnett*, 853 P.2d at 231. *See also* 21 O.S.1991, § 172. "Aiding and abetting in the crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Barnett*, 853 P.2d at 231 (*quoting Hindman v. State*, 647 P.2d 456, 458 (Okl.Cr.1982)). "While mere presence or acquiescence, without participation, does not constitute a crime, only slight participation is needed to change a person's status from mere spectator into an aider and abettor." *Id.*

¶ 67 In the instant case, Derrick Smith testified that he saw a two door gray hatchback approach, stop and the drivers' side door open. He saw Appellant, Paris Powell and someone in the backseat shoot at Farrow and him. When the gun fire ceased, he heard Appellant say, "Fuck 'em." Under the facts of this case, it is irrelevant whether Appellant actually inflicted Farrow's and Smith's wounds. The evidence certainly shows that he aided and abetted the others in the vehicle with the intent to kill. Because the evidence is sufficient to sustain Appellant's convictions, this proposition is denied.

¶ 68 In his seventh proposition, Appellant claims the trial court violated his constitutional rights by failing to instruct the jury on second degree murder. Without an instruction on second degree murder, Appellant argues the jury's only options were to convict or acquit him of first degree murder. Appellant maintains that the trial court's failure to *sua sponte* provide the jury with a third, non-capital option violated his Eighth and Fourteenth Amendment rights. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Because Appellant failed to enter a specific objection to the instructions administered or request alternative instructions, this Court will review for plain error. *Johnson*, 928 P.2d at 315.

In *Charm v. State*, 924 P.2d 754, 760 (Okl. Cr.1996), we stated:

> *Beck* ... held that 'in death cases, the jury must be instructed on lesser included non-capital offenses *supported by the evidence*, in order to give the jury a viable option between acquittal and a death penalty offense.' Thus, lesser included offense instructions need not automatically be given in death cases, but are required only when supported by the evidence. (footnote omitted) (emphasis in original)

¶ 69 Title 21 O.S.1991, § 701.8(1) defines second degree murder as a homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual...." The facts in this case show that Appellant met with other boys shortly before the murder in Pitts Park and planned a drive-by shooting on the south side of Oklahoma City. Appellant, Paris Powell and some unidentified person(s) went to the south side of Oklahoma City and opened fire on Smith and Farrow. As they were leaving, Appellant said, "Fuck 'em." Nothing in these facts suggests anything but a premeditated design to effect the death of Smith and Farrow. These facts do not support a second degree murder instruction. Further, Appellant testified that he was not present during the shooting, thereby electing a defense of innocence which rendered second degree murder in-

structions incompatible with his defense. *Palmer v. State*, 871 P.2d 429, 433 (Okl.Cr. 1994). Because the evidence in this case did not support an instruction on second degree murder, we find the trial court did not err in failing to administer one. Accordingly, this proposition is denied.

¶ 70 In his tenth proposition, Appellant claims the trial court erred in admitting impermissible evidence of another crime. Andrea Laster testified that she, two SEV gang members and her sister were walking through the Ambassador Court Apartments at 11:30 p.m. on June 23, 1993. Laster claimed she saw two cars, a Buick and a Datsun hatchback, drive through the apartments in a "wild way." She said she saw Appellant in the Datsun hatchback and heard his voice say, "Them is 'Nut's sisters." The two SEV gang members pulled out their guns and ran when they saw the cars. Laster heard someone say "Hoover" from the car which she said was disrespectful to the SEV gang members. Laster said she then saw Appellant holding a gun out of the car window but not pointing it at anyone.

¶ 71 Prior to trial the State filed a *Burks* [31] notice detailing the other crimes evidence it intended to introduce at trial. Prior to Andrea Laster's testimony defense counsel moved *in limine* to exclude Laster's testimony because it was irrelevant, incompetent and immaterial since the murder occurred twenty-four hours after the above incident. The State argued the evidence established Appellant's identity. The trial court overruled the motion and counsel's request for an *in camera* hearing.

■ ¶ 72 Evidence of uncharged other crimes is inadmissible in a criminal trial to prove action in conformity therewith. However, such evidence may be admitted if it proves motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. *Burks v. State*, 594 P.2d at 772. *See also* 12 O.S.1991, § 2404(B).

■ ¶ 73 The State theorized that the shootings in the instant case were gang relat-

ed and were in retaliation of a prior altercation between the SEV and Hoover gangs in which a SEV member killed a Hoover member. Appellant defended by claiming he was not present at the shooting and by attacking the surviving victim's credibility and identification. The State offered the testimony of Andrea Laster to prove identity and motive. Laster placed Appellant with a gun in the same hatchback used in the drive-by shooting that resulted in Farrow's death and Smith's injuries the night before the murder. Laster claimed Appellant's actions the night of June 23rd were disrespectful to the two SEV members on SEV turf. Laster also testified she was aware that the SEV's and the Hoover's were not getting along and that Appellant disliked Smith, thereby supplying evidence of motive. Because this evidence was relevant and admitted to prove identity and motive, we find no error in its admission.

¶ 74 In his eleventh proposition of error, Appellant claims prosecutorial misconduct deprived him of a fair trial. Appellant argues the prosecutor improperly argued in first stage closing argument that Appellant intimidated witnesses, improperly vouched for the credibility of State's witnesses, speculated on facts not in evidence, called Appellant and defense witnesses liars, denigrated defense counsel, improperly commented on witnesses not coming forward, improperly commented on Appellant's guilt, and elicited evidence and commented on Appellant's invocation of the right to counsel. We will address those remarks that were properly preserved by timely objection and the remaining will be reviewed for plain error. *Spears*, 900 P.2d at 441.

¶ 75 Appellant claims the prosecutor improperly argued facts not in evidence when he argued that Paris Powell rather than Appellant's mother bonded Appellant out of jail on June 23. At trial Appellant testified his mother bonded him out of jail on June 23 and that he was in the process of being released at the time Andrea Laster claimed she saw Appellant with a gun driving through the Ambassador Court Apartments in the same

31. *Burks v. State*, 594 P.2d 771 (Okl.Cr.1979), overruled in part on other grounds, *Jones v. State*, 772 P.2d 922 (Okl.Cr.1989).

car used in the drive-by shooting. A fair inference from Appellant's and Laster's testimony was that Powell was present when Appellant was bailed out of jail and that Appellant left the police station with him in the gray hatchback. Accordingly, the prosecutor's argument was not error.

¶ 76 Next, Appellant claims the prosecutor improperly argued that Appellant lied to the jury when the prosecutor argued that Officer Kuhlman investigated Appellant's alibi story and concluded it was false. This argument was proper since Appellant admitted that the alibi story he told police was a lie.

¶ 77 Appellant also argues the prosecutor improperly commented on his invocation of his right to counsel. During cross-examination, the prosecutor asked Appellant about the circumstances surrounding his statement to the police in which he told the police he had an alibi. Defense counsel objected to questions concerning communications between Appellant and his lawyer. The trial court overruled the objection. The prosecutor then asked Appellant about how he came to give his statement which included testimony concerning a conversation between Appellant and his lawyer. Appellant testified he spoke with his lawyer after his arrest and advised that he was suspected of murder. Appellant explained to his attorney that he had declined to make a statement to the police until the attorney could be present. The attorney advised they would talk with the police the following morning.

¶ 78 While the testimony concerning the substance of his conversation with his attorney was technically privileged, 12 O.S.1991, § 2502, this error does not require reversal or modification. "[P]rosecutorial misconduct will not cause a reversal of judgment or modification of sentence unless [its] cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding." *Spears*, 900 P.2d at 445. The prosecutor elicited the non-inculpatory privileged information as he questioned Appellant about his bogus alibi. In light of the evidence admitted at trial, we find the prosecutor's solicitation of non-inculpatory privileged information did not contribute to the verdict or

affect the fairness of the trial. *Id.* Further, we have reviewed the remaining comments not properly preserved and find no plain error.

¶ 79 Next, Appellant argues that in the second stage closing the prosecutor improperly argued the absence of Charles McGee, improperly shifted the burden of proof to Appellant to disprove the aggravating circumstances, improperly attacked the defense's expert witnesses, denigrated and degraded Appellant, denigrated the mitigating evidence, diminished the juror's sense of ultimate responsibility for punishment, made improper appeals to juror's passions and prejudices and invoked societal alarm. Because only one of the comments in second stage was properly preserved by a timely objection, we will address that remark and review the others for plain error.

¶ 80 Appellant claims the prosecutor invoked societal alarm when he argued that he or his children could have been at Crossroads Mall when Appellant and several of his fellow gang members started a fight with two other gang members in one of the stores. The prosecutor was trying to make the point that Appellant's actions showed he did not care for the safety of anyone in society and would constitute a continuing threat. Such argument falls within the wide latitude of argument accepted by this Court. A review of the remaining remarks shows that while a few of them may have been borderline, no plain error occurred that would warrant modification of sentence. *Hammon*, 898 P.2d at 1307. Accordingly, this proposition is denied.

## ISSUES RELATING TO PUNISHMENT

¶ 81 In his twelfth proposition, Appellant argues that improper victim impact evidence was admitted at his trial. The State called Shauna Farrow's mother and grandmother to testify about the impact of her death on their family. A review of the record shows the victim impact evidence admitted in this case was within the acceptable parameters outlined in *Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr.1995), *cert. denied*, — U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54

(1996). The jury was given a "glimpse" of Farrow's life. *Id.* Accordingly, we find no error in the admission of the victim impact evidence.

¶ 82 Next, Appellant argues that victim impact evidence operates as a "super-aggravator" and is irrelevant in Oklahoma's capital punishment balancing scheme. This Court has held that victim impact evidence does not act as a superaggravator and is a relevant consideration under Oklahoma's capital sentencing scheme. *Cargle,* 909 P.2d at 828 n. 15; *Parker v. State,* 917 P.2d 980, 989 (Okl.Cr.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997). We see no need to revisit this issue at this time.

¶ 83 Finally, Appellant argues his due process rights were violated because the jury was not instructed on the legal effects of the victim impact evidence. The jury in this case received the standard second stage instructions on aggravating and mitigating evidence and on its duty to weigh such evidence, but was not instructed on the manner in which to factor in victim impact evidence. In *Cargle,* 909 P.2d at 828–29, this Court adopted a victim impact evidence instruction to be administered in all future capital cases where victim impact evidence is introduced. Because the trial in Appellant's case had already occurred by the time *Cargle* was handed down, the trial judge in Appellant's case cannot be faulted for having failed to administer the *Cargle* instruction. *Charm,* 924 P.2d at 766.

¶ 84 At trial Appellant failed to offer any instruction on victim impact evidence, and did not complain that the trial judge did not administer one. As in *Charm,* Appellant has failed to demonstrate how the lack of a victim impact evidence instruction harmed him. *Id.* In other words, he has not demonstrated that the jury's sentencing discretion was not properly channeled, that the victim impact evidence influenced the jury to impose a sentence not supported by the evidence, or that the evidence was insufficient to support the aggravators found by the jury. *Id. See also Smith v. State,* 932 P.2d 521, 537–38 (Okl.Cr.1996). Accordingly, we find no error.

¶ 85 In his thirteenth proposition, Appellant argues the trial court allowed the State to admit inadmissible and prejudicial evidence to prove the "continuing threat" aggravator. First, Appellant claims the trial court erred in admitting evidence of unadjudicated bad acts, non-violent bad acts and juvenile offenses to prove Appellant constituted a continuing threat. Appellant acknowledges that this Court has consistently held that evidence of unadjudicated bad acts is admissible in a capital case to prove a defendant constitutes a continuing threat to society. *Paxton v. State,* 867 P.2d 1309, 1321–22 (Okl. Cr.1993), *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994). Appellant asks this Court to reconsider its prior holdings or, alternatively, to require the sentencer to first find the defendant committed the unadjudicated offense beyond a reasonable doubt before considering the unadjudicated offense as proof of continuing threat.

¶ 86 In reviewing a similar claim, this Court stated:

> Mindful of the lack of finality in this area of the law, this Court reaffirms its position that unadjudicated offenses may be introduced during the second stage of a capital trial to support the aggravating circumstance of "continuing threat". Prior adjudicated cases resulting in convictions for violent felony offenses support a separate aggravator, "prior violent felony". However, proof of the "continuing threat" aggravator is much more than prior convictions; it is the circumstances surrounding the murder for which the defendant has just been convicted and his prior criminal conduct. This is the primary evidence the State must prove to find the "continuing threat" aggravator. Evidence of a defendant's criminal history is relevant to the jury's determination as to whether the defendant is likely to commit future acts of violence that would constitute a continuing threat to society. Having such evidence for consideration focuses the jury's sentencing determination on the particularized circumstances of the offense and the individual offender. To find the use of unadjudicated offenses improper is a backdoor attempt to find the aggravator unconstitutional contrary to decisions by the United

States Supreme Court. Denial of the evidence deprives the government of the ability to prove a constitutional aggravating circumstance.

*Hain,* 919 P.2d at 1141 (citations omitted).

¶ 87 To prove "continuing threat" the State must show a particular defendant has a pattern of criminal conduct that will likely continue in the future. *Charm,* 924 P.2d at 762. Any relevant evidence showing the probability that the defendant will commit future acts of violence including unadjudicated criminal conduct is admissible. *Id.* at 763. The State's evidence of continuing threat in the instant case consisted of unadjudicated violent acts such as Appellant's involvement in prior shootings and other assaults, unadjudicated non-violent acts such as Appellant's arrest for a traffic violation in which a gun was found in Appellant's car, two attempts to elude police officers, threats to police and an unadjudicated juvenile offense in which Appellant allegedly participated in an armed robbery. We continue to hold that evidence of unadjudicated offenses is admissible and relevant to show that a defendant has a pattern of violent criminal conduct that will likely continue in the future. As such, we find the trial court properly admitted the above evidence and no error occurred.

¶ 88 Next, Appellant claims the trial court erred in admitting hearsay testimony as substantive proof of "continuing threat." During second stage the State called Tania Cole to testify about a shooting incident that occurred outside her apartment. Cole claimed on the stand that she could not remember anything and stated that she did not want to be in court. Pursuant to 12 O.S. 1991, § 2613, the State called Officer Owens who testified he interviewed Cole after the shooting. He testified Cole said she saw several black males arguing outside her apartment and heard two or three shots. She saw the victim grab one of the young men and call him "Yancy."

¶ 89 First, Appellant argues Officer Owen's testimony constituted inadmissible hearsay. The State offered Owen's testimony to impeach Cole with a prior inconsistent statement. As such, Owen's testimony concerning Cole's statements was properly admitted. 12 O.S.1991, § 2613. *See also Omalza v. State,* 911 P.2d 286, 300 (Okl.Cr.1995).

¶ 90 Second, Appellant argues the prosecutor improperly argued such impeachment evidence could be used as substantive evidence to prove Appellant constituted a continuing threat to society. Because Appellant failed to object, we will review for plain error. *Hammon,* 898 P.2d at 1306–07.

¶ 91 Prior inconsistent statements made by witnesses to police cannot be used as substantive evidence of guilt because such statements do not meet the requirements of 12 O.S.1991, § 2801(4)(a)(1). *Omalza,* 911 P.2d at 302. As such the State's argument was improper. However, we must decide if we have "grave doubt" that the outcome of the sentence would have been materially affected had the error not occurred. *Hill,* 898 P.2d at 164. The answer must be no. The State introduced a substantial amount of evidence concerning Appellant's prior criminal conduct to prove a pattern that would likely continue in the future. The prosecutor's few remarks about Cole's hearsay statements does not undermine our confidence in the sentence imposed.

¶ 92 Appellant also contends the trial court erred in admitting post-offense bad acts and crimes to prove "continuing threat." This Court recently addressed and rejected this argument. *Charm,* 924 P.2d at 762–63. There is no need to revisit this issue.

¶ 93 Lastly, Appellant argues the prosecutor improperly argued that the jury could consider Appellant's lack of remorse as proof that he constituted a continuing threat to society. Appellant claims the prosecutor was improperly drawing attention to Appellant's claim of innocence during the first stage of trial. Again, Appellant failed to object and we will review for plain error. *Hammon,* 898 P.2d at 1306–07.

¶ 94 In *Charm,* we noted that one of the most common grounds alleged to prove the continuing threat aggravator is the defendant's lack of remorse. *Charm,* 924 P.2d at 763. In the instant case, Appellant testified in first stage and placed his character in

issue. The prosecutor asked him about a variety of bad acts about which Appellant expressed no remorse. The prosecutor properly argued the jury could consider Appellant's lack of remorse for his prior bad acts in determining whether he would constitute a continuing threat to society. *Smith v. State,* 727 P.2d 1366, 1373–74 (Okl.Cr.1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). Accordingly, we find *no* error.

¶ 95  In his fourteenth proposition of error, Appellant complains the prosecutor's argument that the jury could consider hypothetical bystanders to determine whether Appellant created a great risk of death to more than one person so skewed the jury's finding of this aggravator that their finding cannot withstand review. Because Appellant failed to object to the prosecutor's remarks, this Court will review for plain error. *Hammon,* 898 P.2d at 1306–07.

██ ¶ 96  In the instant case the prosecutor argued in opening statement and closing argument that the jury could consider that the shooting occurred in front of a house, that bullets entered the house and that had the occupants been home, they would have been at risk of death. The prosecutor also argued those who lived anywhere in the vicinity were in indirect danger. · Such argument does not comport with our holding in *Salazar,* 919 P.2d at 1125 in which we stated "that a defendant could not be condemned for what might have occurred, but could be condemned only when his conduct caused a great risk to [actual] bystanders." There must be actual risk to bystanders rather than possible risk. *Id.* Accordingly, the prosecutor's remarks were error.

██ ¶ 97  This Court must now decide if we have "grave doubt" that the outcome of the sentence would have been materially affected had the error not occurred. *Hill,* 898 P.2d at 164. The record shows that Appellant and others opened fire during a drive-by shooting injuring Derrick Smith and killing Shauna Farrow. The jury was properly instructed pursuant to the uniform instructions. Given that the evidence was more than sufficient to support the "great risk of death to more than one person" aggravator, we find the prosecutor's remarks did not materially affect the sentence.

¶ 98  In his fifteenth proposition of error, Appellant argues the "continuing threat" and "great risk of death to more than one person" aggravating circumstances are unconstitutionally vague and overbroad. We have consistently rejected these claims. *Charm,* 924 P.2d at 772; *Valdez v. State,* 900 P.2d 363, 382 (Okl.Cr.), *cert. denied,* 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). *See also Malone v. State,* 876 P.2d 707, 715–16 (Okl.Cr.1994) and cases cited therein. Accordingly, we decline to revisit these claims.

██ ¶ 99  In his sixteenth proposition of error, Appellant claims the trial court's failure to administer OUJI–CR–439 [32] allowed the jury to completely ignore the mitigation evidence presented on Appellant's behalf. Appellant argues OUJI–CR–439 is required to properly channel and guide the jury's discretion. 12 O.S.1991, § 577.2. Appellant maintains that the failure to specifically instruct on the mitigating factors in this case prevented the jury from considering and giving effect to relevant mitigating evidence. Because Appellant failed to object to its omission or request OUJI–CR–439's inclusion in the instructions, we will review for plain error. *Johnson,* 928 P.2d at 315.

¶ 100  In Oklahoma there are no statutory lists of mitigating circumstances. *Romano v. State,* 909 P.2d 92, 124 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). In other words Oklahoma juries are permitted to consider any evidence presented in mitigation and are not limited to consideration of statutorily enumerated circumstances. *Id.* "While Oklahoma law permits defendants to specifically list and highlight certain mitigating circum-

**32.** OUJI–CR–439 provides:
EVIDENCE HAS BEEN OFFERED AS TO THE FOLLOWING MITIGATING CIRCUMSTANCE(S): Note: List mitigating circumstance(s) supported by some evidence.

WHETHER [THIS] [THESE] CIRCUMSTANCE(S) EXISTED, AND WHETHER [THIS] [THESE] CIRCUMSTANCE(S) [IS] [ARE] MITIGATING, MUST BE DECIDED BY YOU.

stances in OUJI–CR 439, such lists are not exclusive." *Id.* Oklahoma jurors are free to consider any evidence which they may feel is mitigating in nature. *Id.* "This scheme broadens the scope of mitigating evidence jurors may consider and ensures capital defendants the fairest possible determination of the weight to be given mitigating evidence." *Id.*

¶ 101   In the instant case, Appellant presented eight witnesses in second stage to prove a variety of mitigating circumstances. The jury was then instructed that mitigating circumstances are those which, in fairness and mercy, the jury considered to be extenuating or reducing the degree of Appellant's moral culpability or blame. The jury was correctly instructed that it was their sole responsibility to determine what the mitigating circumstances were under the facts and circumstances of the case. The jury was further instructed that mitigating circumstances need not be proven beyond a reasonable doubt. Finally the jury was instructed that before it could impose a sentence of death it had to first find that an aggravating circumstance existed beyond a reasonable doubt and that the aggravating circumstance outweighed any mitigating circumstances. These instructions were sufficient to channel the jury's discretion and in no way allowed them to ignore any mitigating evidence. While trial courts should list mitigating circumstances utilizing OUJI–CR–439, the failure to do so in this case does not amount to plain error. Accordingly, this proposition is denied.

■■■ ¶ 102   In his seventeenth proposition or error, Appellant contends the trial court erred in its response to the jury's question regarding the meaning of life with-

out parole. *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality).[33]

¶ 103   During deliberations, the jury sent out a note asking, "[i]s 'Life without Parole' exactly what it says, or-is there a possibility of early release or *any* release?  Please explain" (Court's Exhibit 1) The trial court responded in writing stating, "You have all the evidence and instructions needed to reach a verdict."  Appellant had requested the following instruction which was refused by the trial court:

> You are to assume that if you sentence YANCY LYNDELL DOUGLAS to life imprisonment or life imprisonment without the possibility of parole, he will spend the rest of his life in prison.  Likewise, you are to presume that if you sentence YANCY LYNDELL DOUGLAS to death, he will be executed by means of lethal injection. You are to make no other presumptions.

¶ 104   As both parties point out, this Court has rejected similar claims in several cases. *Johnson,* 928 P.2d at 319; *Mayes,* 887 P.2d at 1316–18; *McCracken v. State,* 887 P.2d 323, 334 (Okl.Cr.1994), *cert. denied,* 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995).  In *Mayes,* this Court found that a response such as "the instructions were self-explanatory" is the response that judges should provide to jurors' inquiries regarding the meaning of life without parole as a sentencing option. *Mayes,* 887 P.2d at 1318. The response given in the instant case comports with *Mayes* and therefore, we find no error.[34]

■■■ ¶ 105   Appellant also complains the trial court did not follow the procedures outlined in 22 O.S.1991, § 894 [35] in answering

33. In *Simmons,* the Court held "that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons,* 512 U.S. at 156, 114 S.Ct. at 2190, 129 L.Ed.2d at 138.  "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id.* at 171, 114 S.Ct. at 2198, 129 L.Ed.2d at 147.

34. I reach this decision by reason of *stare decisis.* However, I continue to believe that jurors' questions regarding life without parole should be answered.

35. 22 O.S.1991, § 894 provides:
    After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court.  Upon their being brought into court, the information required must be

the jury's question. The record before this Court shows the trial court did not summon the jury back into the courtroom but sent the jury only its written answer. The State argues that even if the trial court failed to comply with section 894, Appellant was not prejudiced since the trial court gave the jury a proper response.

[62] ¶ 106 "When a communication between a judge and jury occurs, after the jury has retired for deliberation, a presumption of prejudice arises." *Givens v. State*, 705 P.2d 1139, 1142 (Okl.Cr.1985). "That presumption may be overcome if, on appeal, this Court is convinced that, on the face of the record, no prejudice to the defendant occurred." *Givens*, 705 P.2d at 1142. As in *Givens*, Appellant was not prejudiced when the trial judge answered the jury's note without calling the jury and parties back into the courtroom. *Id.* However, to avoid any error, trial courts should follow the dictates of section 894 or obtain waivers from the parties. This proposition is denied.

¶ 107 In his eighteenth proposition of error, Appellant contends he was denied effective assistance of trial counsel as guaranteed by the Sixth Amendment. Appellant cites as deficient performance trial counsel's failure to object to certain jurors for cause, counsel's opening the door for bad character evidence, counsel's failure to request second degree murder instructions, counsel's failure to object to instances of prosecutorial misconduct and counsel's failure to present available mitigating evidence in second stage.[36]

¶ 108 To successfully prove ineffective assistance of counsel, Appellant must show: (1) that defense counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Spears*, 900 P.2d at 445. Failure to prove either of these

elements is fatal to Appellant's entire claim. *Spears*, 900 P.2d at 445.

¶ 109 First, Appellant claims counsel was deficient because he did not remove for cause prospective jurors Travis and House whom he claims were admittedly biased against him. He contends both expressed an open hostility towards gang members and indicated such hostility would negatively affect their deliberations. The record shows prospective juror House stated several times he could be fair despite his hostility towards gangs. Prospective juror Travis refused to give unequivocal statements. He stated that he thought the death penalty was an appropriate punishment in some instances but he could not vote for it. He also said his feelings about gangs could affect his ability to vote for the death penalty, but that he was not sure.

¶ 110 Appellant relies on *Presley v. State*, 750 S.W.2d 602, 607–08 (Mo.Ct.App.1988) in which the court held that failure to remove an admittedly biased prospective juror constituted ineffective assistance of counsel. The instant case is distinguishable since counsel did remove House and Travis with a peremptory challenge. Since Appellant does not claim the twelve jurors who sat in this case were biased or not impartial, counsel was not deficient in failing to remove these jurors for cause.

¶ 111 Next, Appellant claims trial counsel was deficient because he opened the door for character rebuttal evidence. Counsel did not open the door. Counsel asked Appellant about his gang name and remarked that it did not seem to reflect violence. It was Appellant who exceeded the scope of the question and volunteered that he was not a violent person. Fearing Appellant's examination would not benefit his case, counsel advised Appellant prior to taking the stand not to testify. Counsel cannot be held ineffective for Appellant's voluntary non-re-

given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

**36.** Appellant requests an evidentiary hearing pursuant to Rule 3.11, *Rules of the Court of Criminal Appeals*, 22 O.S.Supp.1997, Ch. 18, App. to investigate his claim of ineffective assistance of

trial counsel. This request is being denied under separate order because we find that Appellant has failed to provide this Court with sufficient information to show by clear and convincing evidence that there is a strong possibility that counsel was ineffective for failing to utilize the complained-of evidence.

sponsive comment which put his character in issue.

¶ 112 Appellant claims counsel was also deficient in failing to request second degree murder instructions. As stated above, second degree murder instructions were not warranted in this case. As such, counsel was not deficient in failing to request them. *Spears,* 900 P.2d at 446.

¶ 113 Next, Appellant claims trial counsel was deficient because he failed to object to instances of prosecutorial misconduct, particularly the prosecutor's argument that Appellant was involved in witness intimidation. As we have stated before, "deciding when and if to object to portions of the prosecutor's closing arguments is a matter of trial tactics and strategy." *Id.* at 446 (*quoting Fisher v. State,* 736 P.2d 1003, 1013 (Okl.Cr.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988)). Having found that none of the alleged improper prosecutorial comments or arguments were so grossly improper as to have affected the verdict or sentence, Appellant has failed to show that trial counsel was deficient in failing to make proper objections. *Spears,* 900 P.2d at 445.

¶ 114 Lastly, Appellant claims counsel failed to utilize available mitigating evidence to rebut the State's continuing threat contention. Appellant specifically argues counsel failed to present a mental health expert to testify that he suffered from Attention Deficit Hyperactivity Disorder (hereinafter ADHD) which affects impulse control and reasoning ability.[37]

¶ 115 A review of the record shows trial counsel did put forth a mental health expert to rebut the State's continuing threat contention. At trial, counsel called Dr. Herman Jones who had examined Appellant in January 1992 to determine if Appellant should remain in the juvenile system. Dr. Jones testified that he interviewed Appellant, administered several psychological tests and collected background information. After reviewing the records, Dr. Jones concluded that Appellant suffered from an antisocial personality disorder, but could be rehabilitated. Because Dr. Jones found that Appellant was amenable to rehabilitation, counsel argued that Appellant was not a continuing threat. The mere fact more evidence could have been presented is not, in itself, sufficient to show counsel was deficient. *Allen v. State,* 923 P.2d 613, 617 (Okl.Cr.1996), *vacated and remanded,* —— U.S. ——, 117 S.Ct. 1551, 137 L.Ed.2d 699 (1997). Given the fact that the evidence of Appellant's amenability to rehabilitation and background was credible and well developed, we find Appellant has failed to carry his burden to show either deficient performance by counsel, or prejudice from the omission of this specific evidence. Accordingly, this proposition is denied.

¶ 116 In his final proposition of error, Appellant challenges several of the second stage jury instructions. First, he asserts it was error to fail to instruct the jury that findings of mitigating circumstances need not be unanimous. We are not persuaded by Appellant's speculation that the jury would read into the instruction on mitigating circumstances a requirement of unanimity merely because the instruction on aggravating circumstances had such a requirement. *Harjo v. State,* 882 P.2d 1067, 1081 (Okl.Cr. 1994), *cert. denied,* 514 U.S. 1131, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995). Without facts to support this speculation, we find no merit in this argument. *Id.*

¶ 117 Second, Appellant argues the instructions permitted the jury to ignore mitigating evidence. The instructions in the instant case clearly defined what constituted mitigating factors and did not invite the jury to ignore such evidence. *Harjo,* 882 P.2d at 1081–1082. Furthermore, it would be an inaccurate statement of the law to instruct the jury that it "must" consider the mitigating evidence presented to reduce blame since

---

37. In conjunction with his request for an evidentiary hearing, Appellant submits an affidavit from Dr. Ray Hand, who concludes that Appellant's history is consistent with a diagnosis of ADHD, that ADHD is treatable and that at the time of the offense Appellant was untreated. Dr. Hand states that research indicates that Appellant's conduct would have been moderated had he received appropriate treatment.

that would take away from the jury its duty to make an individualized determination of the appropriate punishment. *Pickens v. State*, 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994). As such, we reject Appellant's argument.

¶ 118 Finally, Appellant argues the instruction regarding the weighing of aggravating and mitigating circumstances was contrary to the dictates of 21 O.S.1991, § 701.11. This argument was rejected in *Mitchell v. State*, 884 P.2d 1186, 1207 (Okl.Cr.1994), *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995), and we see no need to revisit this issue at this time. Accordingly, this proposition is denied.

### MANDATORY SENTENCE REVIEW

¶ 119 Pursuant to 21 O.S.1991, § 701.13(C), we must now determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. As noted above sufficient evidence existed to support both aggravating circumstances alleged by the State: great risk of death to more than one person; and continuing threat to society. In mitigation Appellant presented evidence of his youth, his good work history with his father, loving relationships with his family and his potential for rehabilitation. After carefully weighing the aggravating circumstances and all mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate. We further find no error which warrants reversal or modification. Accordingly, Appellant's conviction and sentence are AFFIRMED.

LUMPKIN and JOHNSON, JJ., concur.

CHAPEL, P.J., and LANE, J., concur in result.